is 25-154 United States v. Margaret Bivens. Thank you. Actually, let's take a second. Just let the folks get out and you can have undistracted attention on your argument. All right. Thank you, Judge. Thank you, Judge. May I proceed? Yes. Thank you. I'm Richard Levitt, along with my partner, Zach Siegel. We represent Marvin Bivens on appeal. We also represented him at trial. We've raised six issues here. Primarily, he was convicted of murder in aid of racketeering. The government alleged that he killed Sean Pert in part to maintain or increase his position in the 5-9 Grants. One of the issues, our first issue, in fact, is a sufficiency issue. That's an issue that obviously requires a great deal of attention to the specifics of the trial testimony. It's not something that I think I can probably cover in the 10 minutes that we have. However, I think that some of the facts that are relevant to the sufficiency issue are also relevant to all of the other points that we raise. So what I intend to do this morning is first to discuss a few of the issues with regard to the sufficiency point, and then to move on to the two jury instruction points. And if there's any time left, I'll try to address certain of the other points. Of course, I'll answer any questions the Court has about any of them. The government's principal witness, Marcus Labore, testified that Pippins had no loyalty at all to the 5-9 Grants, affirmatively testified to that. That in and of itself establishes that he had no motive linked to the 5-9 Grants when he killed Sean Pert. And, of course, he testified at trial that he had purely a personal motive because he believed that Sean Pert and the real rights had murdered his twin brother, Mellie. But Marcus Labore acknowledged that Mr. Pippins had no loyalty at all to the 5-9 Grants. Mr. Pippins consulted no one in the 5-9 Grants before he killed Sean Pert. In fact, Marcus Labore, who had been the godfather of the 5-9 Grants, did not even know that Mr. Pippins had killed Sean Pert until the following year when he got out of – Could you put your comments and your arguments in context, though? Because, you know, we have the – we end up talking about the jury instruction about an enterprise related purpose or not for Vicar murder. And we have a whole panoply of gangs of different kinds that were part of the action here, right? Sure. So the real right, the 5-9 Brim, the subsidiaries of the Bloods, and then Bread Gang. And I gather there's a dispute about what Bread Gang was, whether it was a gang, whether it was not a gang, or what have you. And so it's not entirely clear to me that the testimony you've just discussed rules out that there was an enterprise-related purpose as well as potentially a personal purpose in the murder. Sure. That's a very important question. The enterprise that was the named enterprise in the indictment, the enterprise that the government had to prove Mr. Pippins acted on behalf of was the 5-9 Brims, period. But what if, as alleged, the Bread Gang was kind of a subsidiary offshoot based on location?  I mean, that's how gangs operate. There are – That's directly relevant, Your Honor, to our second jury instruction point, which is point three in our brief. What we asked the Court to instruct the jury was that if the jury found that Mr. Pippins was not motivated to kill Sean Perk by his association with the 5-9 Brims, but did find that he was motivated by his relationship to the Bread Gang, then the jury would have to decide whether or not the Bread Gang and the 5-9 Brims were related in some way. And the Court declined to give that instruction, which was a critically important instruction. We also included in our instruction criteria that the jury could consider when trying to resolve that issue if they had to do so. But the evidence was overwhelming, including from Marcus Laborde himself, that the Bread Gang was not part of the 5-9 Brims. In fact, he said that the Bread Gang was part of the Folk Nation. The Bread Gang had members who were 5-9 Brim members, but it also, said Laborde, had members who were not. In fact, they had members who were also members of gangs that rivaled the 5-9 Brims. So there was overwhelming evidence that, in fact, the Bread Gang was not part of the 5-9 Brims, and therefore, if Mr. Pippins was motivated by any gang relationship at all, and if the jury found that it was the Bread Gang, then it could not have convicted Mr. Pippins. However, when we asked for that instruction, which was a correct instruction, the Court denied it. And the government says, well, it wasn't a clear instruction that you asked for. It was an accurate instruction. And if the syntax was confusing because, of course, we were doing this in real time, that's not the issue. The government could have said, well, maybe we have to clean it up to make it a little more understandable. But the instruction that I requested itself was entirely accurate. What it simply said was that if you find he wasn't motivated by at all by his relationship to the 5-9 Brims, but was motivated by his relationship to the Bread Gang, then you have to decide whether or not the Bread Gang was part of the 5-9 Brims, a very important issue in the case. And we were denied that jury instruction. The first jury instruction that we sought, which we were also denied, concerned the motive question. And the judge said, I'm going to instruct the jury that it doesn't matter how strong the motive was related to the gang. It doesn't matter. It could have been infinitesimal. It could have been minuscule. It could have been de minimis. Did she say it could be infinitesimal? I don't think she said that. I think she said it had to be the general purpose. Well, actually it's – But your proposed jury instruction gave two alternatives. You said the – you wanted the court to instruct the jury the enterprise-related purpose in committing the act must be more than merely incidental and must be within the defendant's general purpose. What – Or you said in the alternative it has to be in some way integral to the defendant's But you offered those in the alternative. And to my reading, the enterprise-related purpose must be more than merely incidental and within the general purpose seemed to conform pretty well to what the district court ultimately instructed. No, because the final – Yeah. No, Your Honor. Because the final – and this is where the government has confused the issue. We had made an initial request, and then we had refined the request. And the court was very clear about which request it was denying. And the request that the judge said that she was denying was our request that she instruct the jury that the gang-related purpose had to be integral to his membership or his association with the gang or had to be a substantial motivating factor. But when, Your Honor, she gave the instruction to the jury, here's what she said. Here's what she said after giving the general instruction. I have it in front of me. On page GA-1165 or transcript 2126, however, if, however, you find that the defendant was not motivated at all by the desire to gain entrance to or maintain or increase his position in the enterprise, but was motivated only by other factors, then you cannot find him guilty of this count. So the instruction in essence told the jury that the only way he could escape liability for this motivation was for the jury to find he was not motivated at all. But she started out by saying that the government has to prove beyond a reasonable doubt that the defendant's general purpose in committing the crime of violence was to gain entrance and to maintain or increase his position in the enterprise. It was not required to prove that it was his sole or principal motive, just one of his purposes. Certainly. She didn't use the word infinitesimal or minuscule. That's what your understanding not motivated at all to mean. Is that right? How could the jury have received any other understanding where the court said he can escape liability only if the jury found he was not motivated at all? So do we look at that apart from her general language, the opening that said it had to be a general, one of his general purposes? Sure. Because I think when you have general and specific language, you have to focus, lastly, on the specific language. And the specific language was exactly what I read. And in a case where this Court finds, and this happens quite often, if a court gives a correct instruction and an incorrect instruction, then obviously the jury can't parse that. And the Court will reverse if there's a correct instruction and an incorrect instruction. The Court erred in two ways. The Court erred first by giving the instruction that it did, and the Court erred in not giving the instruction that was requested, which was an accurate instruction. So those are the two jury instruction issues that we raised. Thank you. With regard to the law — may I continue? Please. Thank you. With regard to our fourth issue concerning Mr. Watson's statements, the question was whether or not his statements were relevant. The Court thought they were not relevant and excluded them also on 403 grounds. How could this not be relevant, Your Honor, when he said to his girlfriend, it was ka, it wasn't me, I was trying to hold it, but it was ka, he was just going crazy, I couldn't control. The only person who knows about ka is you. And then he says, he was part of me. How is that possible if I know he's doing that, but I can't stop him, but I know he's doing that. I don't know how to explain it. And then he says, if I tell people that ka is inside of me, watching inside of me, then he's going to take over and he's going to hurt me. So he's — The disconnect between your argument about that and what I heard in the tape is that he's describing an irresistible force coming from inside to talk. In your argument, he's describing an irresistible force inside of him causing him to lie. And I didn't hear anything in that phone conversation that said ka is making me lie rather than that ka is making me spill the beans. Well, first, unfortunately, I don't have the entire transcript in front of me. I believe that that was stated within the transcript itself, well, within the tape itself, but I would say this. Certainly, if a witness testifies that the words coming from his mouth are not his words, but the words of an outside entity that has taken over his brain, whether you want to say — you meaning the government — wants to say, well, he didn't actually say I was lying, although I believe he did, but it really doesn't matter. Well, you just read a whole bunch from the record as to what he did say, and then you're telling me you don't have the place that you're relying on for the lie part? But assume for a moment that he didn't use the word lie. Assume that. Okay. Is this any less strong because of that? Certainly not. He says a foreign entity is controlling what he says. So he's not saying necessarily what he wants to say. He's saying what somebody else is telling him to say. And a jury shouldn't be aware of that. That's not — You have to satisfy 803 to get that in, right? Well, we would have — I'm sorry. Satisfy which? Rule 803. Sure. But — How do you get around the proximity barrier in 803? Well, it doesn't have to — it doesn't have to be at exactly the same time. In this case, Your Honor, in this case, you have a gentleman who clearly is a liar because he admitted it several times. He was caught in numerous lies. He set people up. He created documents to con people and to cast blame onto other people when he was really the one who was blameworthy. And you brought all that up in cross-examination. Yes, but the problem was — here was the problem, Your Honor. The problem was — You beat him up pretty badly. Excuse me? In cross. Yes, Your Honor. The government had the argument with regard to Watson. Well, you can believe him now. He may have lied 5,000 times in the past, but you can believe him now because the only way he gets the benefit of his cooperation is by testifying truthfully. They didn't have that argument. They wouldn't have had that argument with regard to these statements, with regard to Carr. And they wouldn't have that argument because he's saying somebody else is speaking through me. And that's not an argument that would be meant by what the government had argued to the jury about, well, he has to tell the truth because that's the only way he can get a benefit. The issue was whether or not it was relevant testimony. We cite numerous cases where courts have said that where you have somebody who clearly has some kind of extreme psychological problem, that's relevant. A jury should know about it. And, you know, we can cross-examine witnesses about their prior bad acts, their prior convictions that are 10 years old. This is something that was happening in 2018. In fact, it happened shortly after he and Mr. Pippins fenced the stolen phones together. So it wasn't like it was old. That was five years before the trial. Five years before the trial, sure. And three years after the events. Sure. But you can go back 10 years and show that a crime that occurred 10 years ago is relevant to a witness's credibility. And this was not that long ago. And if the government wanted to argue, well, maybe this little guy is no longer in his head, I mean, they could have argued that. But for us to be denied the opportunity to let the jury know that, in fact – One of the reasons the judge relied on was that for – under 803, the call had to occur at a time while Watson was perceiving, quote, any event or condition, unquote, about what he had to testify. So why was Judge Shen incorrect when she ruled he had met that 803-1 condition? Because courts routinely have permitted – and we cite many of the cases in our brief,  Courts have routinely permitted this kind of evidence to come into play. It is not only an 803 issue. It can be admitted for other purposes as well, not just a prior inconsistent statement or something like that. Well, the judge treated – It's an abuse of discretion, I guess I'm asking. Excuse me? Since it could go – since you conceded there are courts on one side of this issue and courts on the other side of this issue. I think that in this context – I think that in this context where he denied making the statement to his girlfriend – so in other words, she originally – she, Her Honor, originally said, if you ask him whether or not – you can ask him whether or not he's had this guy con his head. And I asked him and he said no. And then she said, you can then ask him whether or not he ever said that to his girlfriend. And if he denies it, I'll let the statement in. That's what she originally said. So that would be prior inconsistent statement examination. So I asked him, have you ever had this guy con your head? He said, well, you know, when I was young, I would play with my mom or talk to her and say there was somebody in my head, but not as an adult. And then I asked him, well, did you ever say to your girlfriend that this guy, Ka, was in your head talking through you? And he said, I don't remember ever saying that. So I listened to the tape as well. And I am a little confused because I, like Judge Robinson, heard him saying that – his girlfriend was saying, you shouldn't say anything. You shouldn't talk. And he said, Ka makes me talk. I need to talk. And I just say these things. But I didn't hear any reference to lies, so it was difficult to make out. And looking at your brief, you refer to – sometimes controls what he says and through him tells lies. And you refer to page 1018 and 1019 of the transcript. But there it's you saying that he says that Ka takes over his body and has him tell lies. So is there another transcript or something? Because I understood him to be saying, I have an impulse to talk, and I can't keep my mouth shut, not that anyone was telling him to tell lies. It was – again, Your Honors, if he didn't use the word lie, it doesn't matter in this context because he's not just saying I have an impulse to talk. He's saying that there's an entity inside of me that's talking through me. I mean, that's really what he's saying. It says it was Ka. It wasn't me. I was trying to hold it, but it was Ka. He was just going crazy. I couldn't control. The only person who knows about Ka is you. He has part of me. How is that possible if I know he's doing that, but I can't stop him? I mean, and on and on. Whether he says specifically lie or he's just saying Ka is controlling me and speaking through me, I mean, why couldn't the jury hear that? Why isn't that relevant? But when I then asked him whether or not he made those statements to his girlfriend, he said I don't remember, and then I did what the judge told me to do. We played the tape for him outside the hearing of the jury. He said that's my voice, but I don't remember saying it. Now, this is a guy who's an inveterate liar. He's a forger. He creates false documents. He admitted to numerous lies, and now he's saying I don't remember it. That should be a reason to keep the statement out. We satisfied all of the requirements for a prior inconsistent statement. It was admissible. I think we've got your argument on that, and we are going to get to hear from you again in rebuttal. May I just take one minute on the last point, Your Honor? One minute. Thank you. I know I'm going to be held to it. This is an issue that really sticks in the craw of every defense attorney. There is a double standard that's being practiced in the courts. We cite numerous cases where the government is allowed to say all sorts of things about defense counsel during their summation, including in rebuttal summation when we can't reply. And yet when I make an entirely reasonable argument that they were trying to train the jury and that they were being tricky in trying to train the jury by concocting this whole idea of five nine brims from Marlborough instead of saying bread gang because they had to draw an association between bread gang and five nine brims, I was allowed to say that that was sneaky because the government has a – the jury has an assumption that the government is being truthful, that they can believe the government, and I had to level the playing field. And I had to show that this was sneaky and this was wrong. And instead of being permitted to argue it, it was the – the court said that I was the one who was acting improperly by having the audacity to criticize the government, making me take a 20-minute break, making me purge my argument and my files of any criticism of the government and move on. That was not fair. And there shouldn't be a double standard in this Court with regard to what can be argued on closing argument. Thank you.  Attorney Oken? Yes, Your Honor. May it please the Court. My name is Lindsay Oken, and I represent the government in this appeal. I also represented the government as part of the trial team below. Several of the defendants' six arguments on appeal suffer from the same sort of foundational flaw of taking an exceedingly generous and defense-favorable view of the evidence at trial rather than appropriately viewing it in the light most favorable to the government. The disputed issues in this trial were particularly narrow, and on those narrow issues, the proof overwhelmingly established the defendant's guilt. Can I focus you, then, on the jury instruction issue, which really isn't driven by the evidence? Sure. And I have to confess I'm genuinely perplexed by this question of what quantum of purpose, of enterprise-related purpose you need to convict under this statute. If you look at the statute, it says the purpose, for the purpose. And so then you think, oh, well, it's got to be the purpose. But we've said, no, it doesn't have to be the only purpose or even the primary purpose. The instruction says it has to be the general purpose. But if I said, well, what's the general purpose, I might still think it would be primary or sole. I don't really know what the general purpose means. But then it says, no, it doesn't have to be the sole and principal motive. So now the question is, okay, what does it have to be? Does it have to be a substantial contributing factor? Does it have to be for a cause? And what the instruction goes on to tell us is that if he was motivated at all, and the argument was made specifically to the district court, if you say that, you're saying that even an incidental enterprise purpose is enough to get you there. Is the government's position that that's right, that even an incidental purpose to advance or maintain the gang status, if it's 99% personal, it's still sufficient to satisfy the standard under the statute? I understand the question, I think. And so I think the government's position is that there is a place where a defendant's gang-related motive can be so, so slight that it might not satisfy the statutes. But I think this Court's precedent gives us pretty good guidance that was adopted in the district court's language that sort of gives the jury a clear enough sense of what the defendant's purpose has to be. Well, no, it says not motivated at all by the desire. And that's that — I don't understand how that — I mean, if you're saying there is some level at which it's too small to count, that instruction says no, there's no level at which it's too small to count. So I think it says something slightly different, and defense counsel has characterized it as saying that, but it actually sort of says the inverse. It doesn't say you may convict on any amount of proof above that. It says you must acquit if the defendant's motive to maintain or increase position — if the defendant, sorry, was not motivated at all. You don't think the implication is if you find he was not motivated at all but was motivated only by other factors, then you cannot find him guilty of this count? It doesn't suggest to the jury that if it finds that there was a very small incidental enterprise purpose, they — I mean, that seems to me that — I understand your point that it's phrased as saying, like, the circumstances under which you can't convict, but it seems pretty clear that it's suggesting that other than this carve-out, you can convict. I don't think so for a couple of reasons. Number one is that general purpose language that's put up front, which says that the defendant's general purpose in committing the crime of violence must have been to maintain or increase his position. What does that mean, the general purpose? I would think that would mean the primary purpose until I see our case law that tells us it means something different. Well, so I actually think that's the right idea, is that it's actually pretty strong language, probably stronger than what the statute might require. Well, no, the statute says the purpose, so it might even require the only purpose or the primary purpose. I should clarify what this Court's precedent has said is required. Right. So I think it is quite strong language and undermines any notion that this jury did, in fact, convict based on the hypothetical 1 percent purpose. The jury had no notes questioning this topic, suggesting that they understood what was required of them. I think that general purpose language does a lot of work in this case. But on top of that, there is – And do you think that that general purpose language is consistent with the suggestion that you can find him – you can't find him guilty if he had no motive, no enterprise motive? I guess you're rejecting the implication that the minimus motive would be enough. You're saying that the instruction doesn't really say that. I don't think the instruction says that at all. I think it says that no – that 0 percent equals mandatory acquittal, and that beyond that, it must be the defendant's general purpose. And I think, you know, it's also consistent with this Court's case law that says this is an element that we construe liberally. And this instruction that the Court gave draws directly from both this Court's case law. It mirrors the Sands jury instruction on this topic. The Eighth Circuit actually faced this sort of identical question. What do you do with – I mean, the district court specifically explained its decision to stick with this instruction by saying, I think there's a possibility that the jury might find that it was a motive, but maybe not a substantial motivating factor, and so if I gave your instruction, I might deprive the government of its conviction under these circumstances. Even the trial judge intentionally recognized that this instruction didn't require that it be a substantial motivating factor. Was the trial judge wrong about what the instruction meant? No, but I think what's sort of difficult about the record here is that there was a little bit of a moving target in terms of what the proposed instruction was. So we were starting with proposed instruction that said this must be the defendant's animating purpose. And I do think that probably would have heightened the government's burden beyond what's required. The other – Why is being an animated purpose a higher burden than being a general purpose? Well, I think part of the problem was it was the animating purpose as opposed to a animating purpose. Okay. But the instruction that was given was the general purpose, not a general purpose. Yes, which I think sort of tells the jury – makes it an even stronger instruction. And so I think saying the animating purpose would have required the jury – the use of – it's the use of the term animating there that is sort of suggesting that almost that it's closer to exclusive purpose, right, which is what this Court has said is not required. One of the defense's – the proposed instruction was that the enterprise-related purpose must be more than merely incidental and must be within the defendant's general purpose. And in the alternative, he used the language animating purpose and, in some way, integral to the defendant's membership in the enterprise. So given – if you take the view that animating purpose is like a predominating purpose and that it goes beyond what our precedent has required and the defense was going to be satisfied with must be within the general purpose, I look at the jury instructions as a whole and ask myself whether the use of – in, you know, three paragraphs' worth of instruction that not motivated at all, whether that be entitled to look at the instruction as a whole, or should we be concerned that the jury might really be misled by that you have to find not motivated at all in order to acquit? Well, I think the Court should look at the instruction as a whole and that what follows from that introductory paragraph should be read in context with that  I still do push back a bit on the suggestion that the jury was instructed that anything more than not at all was a basis to convict because I think they were told the reverse, that was a basis on which they must acquit. And so I think that read as a whole, where up front they are told this must be the defendant's general purpose, that's pretty – that makes it pretty clear for the jury that a 1 percent motive is not going to be a defendant's general purpose. I also think this instruction had – But that's an argument, though. That's not what the jury was told. The judge, as I read it, Judge Kinn pretty much walked back her initial language about general and placed a burden on defense that I'm not sure I saw justified in the case law. Sorry, what was the last piece? I'm not sure. Judge Kinn walked back her language on general standard. And I guess if – my problem is assuming she did that improperly, do you have any argument that that error was harmless? Absolutely, Your Honor, and I appreciate the question. I think this is not a case where we're talking about – we're not in the world of 1 percent gang motive here. We're not in that universe. I mean, this was sort of your quintessential gang murder. Talk to me about – I know you're – I don't want to completely take off the But we have testimony from Laborde that this is an ethic of the gang. And then we have the fact that he did it. Where else are you getting gang purpose here? Sure. So I think there are at least six different sources of gang purpose in the record. So there are two cooperating witnesses. I'll start by sort of outlining them, and then I'll go into some more detail. There are two cooperating witnesses. There is the defendant's own testimony. There is cell phone evidence. There is social media evidence. And then there was the defendant's own music and the lyrics associated with that music. And so I'll start with Kalief Watson's testimony. So Kalief Watson testified about these general principles, right, about how you are expected to commit crimes for the gang, about how committing crimes affects how members are viewed in the gang. That's page 472 to 75 of the government's appendix. Kalief Watson talked about the specific rivalry between the Five9 Brims and the real rights and how in a rivalry you, quote, deal with them with violence. But Kalief Watson actually went much farther than that. He talked about a specific interaction with the defendant where they greeted each other by exchanging hand signs to identify themselves as members of the Five9 Brims. In that same day, that same course of interactions, the defendant brags to Kalief Watson about having committed the murder. Again, in this same day, there's a car ride where it's Kalief Watson, the defendant, and two other members of the Five9 Brims. And Kalief Watson is offering to help them to get what he calls the drop, meaning the location of these gang rivals, the real rights. And his testimony was that the defendant was, quote, ecstatic at the prospect of doing that. And that's the government's appendix at 541 to 543. During that same interaction, they are playing the defendant's music where he is dissing the real rights. That is also in Kalief Watson's testimony. So that's Kalief Watson. We also have cell phone evidence, primarily from Jeffrey Bush, who was a leader of the Five9 Brims, that distills into writing these gang principles about retaliation and about violence. So the cell phone evidence lays out things like the oath, the rules of the gang, those sorts of things. So quotes like, Hat Boy Salute, If It Ain't Brim, I Shoot. Things like, Never Fear a Foe. Things like, Conquer Our Enemies, Anyone Who Opposes the Army. And some of these, by the way, are transmitted from Jeffrey Bush to the defendant in this case. So they're not just sort of general gang slogans. They're transmitted to the defendant. There's also social media evidence. So there's messages between gang members about hunting down real rights, about locating and targeting the rival gang leader. This was after the incident, wasn't it? Yes, and I think that's actually sort of a powerful fact in this case because it shows that this was one incident as part of a long-running broader gang war that involved a lot of back-and-forth violence. And so I think in terms of... It all developed afterwards. I mean, that could have developed anyway but not motivated him in avenging his brother's death. That's true, although I think that proof of a defendant's motive or intent often comes from these sort of circumstantial places. It's very rare, although this is one of those cases where the defendant himself testified. So it is sort of one of those things that you can pull from to infer the defendant's intent insofar as the defendant remains interested after having committed this murder. He remains interested in targeting gang rivals, whereas the motive that he put forth as his actual motive was a personal vendetta. Well, I think the jury was entitled to infer that if this was in fact a personal vendetta, why does this defendant continue to remain interested in targeting gang rivals? And I think the jury was entitled to draw something from that. I think that's helpful in the sufficiency conversation. I interrupted you when you were responding to my colleague's harmless error question, and I want to let you cycle back to that, but I want to ask you to answer it. In the context of the district court's own statement, I think there's a possibility the jury might find it was a motive but maybe not the substantial motivating factor, and if the law allows the government to win its case that way, I think that's how I should instruct them. Do you think that the district court was suggesting that, in fact, this was a closer case and that there was a reasonable possibility that the jury would find it to be a small motive but not big enough to meet whatever this undefined minimum standard is? I don't know if I can say what the district court was suggesting there. I do know what the trial records show, but I think the district court was well aware that that was the defense's primary argument, that they had opted for a strategy where they conceded identity on the question of murder, and they were really hyper-focused on this element of motive. And so at that point, there was a question of, well, is the jury going to believe the defendant who took the stand, or is the jury going to believe, for example, the two cooperating witnesses? We didn't know the answer to that question at that time. We know it now. The jury did not believe the defendant, and so I think with that we can sort of take a different look at the record in the light most favorable to the government. But do we know if the jury thought that even an incidental gang motivation was enough to get you there? You might not necessarily disbelieve him, but they might understand themselves to be instructed to convict if a gang motive is— I mean, let me ask you. Forget about the instruction. What do you think the—how would you describe the legal floor? Do you think more than incidental is an accurate description of the law, that the enterprise-related purpose has to be more than incidental? I do think that we would concede that there is a level above zero that is still too low, such that it doesn't—I think it's the general purpose language that I keep coming back to. I know, but I'm wondering whether more than incidental would be— is that putting too high a burden on the government, in your view, to say it has to be more than incidental? Too high a burden? No, I don't think so. Okay, because that was—I mean, that was language that was proposed and rejected, right? I don't—I don't know that it was one of the sort of three formulations that were— Okay. —that were fully sort of put forth. But I think the ultimate question for the Court is, was there error in the instruction that this Court gave, that the district court gave, which comes from, which draws from, this Court's case law, the general purpose language, the need not be sole or even primary, which I think says something that this Court has made clear. It does not have to be the primary motive. Right. And so I think when you've got that case law, you've got case law indicating that it's a standard to be construed liberally, and you've got the district court instructing the jury that it has to be his general purpose, and we've got such a strong record on gang-related purpose, there is really no danger here that the jury convicted on a one-percent purpose, and that is simply not what they were instructed when you look at this general purpose language, which, again, is consistent with the Sands jury instruction, and it draws directly from this Court's precedent on how this Court articulates the gang-related motive. Now, I hijack— How do you respond to Sulevitz's criticism, if you will, of how he was—the latitude he was given or not given in his closing argument? Sure. So, you know, I think what was sort of different about this instance is not that it was a stray remark here or there. It was, you know, the district court reminded counsel to remain focused on the evidence, not on the prosecutors, not on the government, and rather than saying, I apologize, Your Honor, I'll move on, or I'll be brief, or I'll keep it focused on the evidence, instead what counsel said was, Your Honor, I have a lot on this. So sort of suggested to the district court, I'm going hard on this. I have a whole module on it. And so this conversation was moved to sidebar where the district court said, you can make this argument. You can make the argument that you want to, but you have to keep it focused on the evidence. You cannot impugn the attorneys at the table. You cannot impugn the government prosecutors. And I think that was particularly true because the argument that was being made was candidly not supported by the record. So I'll talk a little bit now about that point, about the Bread Gang 5-9 point. And I think to sort of take a step back, this was a case where the defendant had to functionally concede that he was a part of Bread Gang. There are photographs of him in Bread Gang T-shirts. I mean, the record was replete with evidence of him in Bread Gang. And so he conceded that. And so in order to distance himself from the charged enterprise, the 5-9 Brims, he had to then draw a wedge between the Bread Gang and the 5-9 Brims. But the testimony at trial did not allow him to do that. So, for example, when Kalief Watson was asked, what is Bread Gang? His answer was a group of 5-9 guys from Marlborough. He was asked specifically, do you know a single member of Bread Gang who is not 5-9? He said no. So the trial testimony is that these are one and the same. And so especially on that record, when defense counsel wanted to take that record and use it to impugn the government's motives and do a whole module on it, I think Judge Chen was well within her discretion to say, I'm going to let you make all of the arguments you want. I'm going to give you as much time as you need to pause and we'll just give the jury a break. But I'm not going to let you impugn the motives of the government prosecutors. And so I don't think that can be fairly said to be an abuse of discretion. Thank you. We kind of hijacked you on the instruction question, and I appreciate your spending time on that. Do you want the opportunity to spend a minute or two addressing any of the other arguments you didn't get a chance to respond to? I think I would, Your Honor. So I'll start with I think we've addressed the summation argument. I'll talk for a moment about the cross-examination of Kalief Watson, which, again, I think the district court did not err at all, much less abuse her discretion in precluding the admission of that call when she allowed for extensive cross-examination on all of those topics, on mental health, on psychological history, on are you hearing voices. She allowed all of those questions to be asked, but on 403 grounds she ultimately precluded admitting the call because she said it is confusing, it is vague, it is unintelligible. I mean, in fact, Kalief Watson's girlfriend throughout the call is saying, I can't understand you, I can't hear you. I mean, it would have been very confusing for the jury, and ultimately, as Judge Chen found, it had little probative value, especially when counsel was permitted to cross-examine on all of those same topics without just simply admitting the tape. I think we probably covered the Bread Gang 5-9 instruction, so I think I'll leave that as it is. You know, I think I'm happy, Your Honors, to talk for a moment about the Giglio-Brady argument, which I do think interrelates a lot with the sufficiency argument, especially on the materiality ground. So I've talked a lot about Kalief Watson, about how that makes this a quintessential gang murder, and I've talked a little bit about the other categories of evidence, but I think, you know, just to sort of put a very fine point on it, in terms of the types of evidence that this Court looks for in assessing whether a defendant has a gang-related motive, this case checks so many of the boxes. So we have a victim who was a gang rival. We have... So are you talking now about the Laborde, or you're just making a general argument? No, I'm sorry. I'm talking about the Brady. So, I mean, that seemed pretty important. Right? It seemed like he was saying, God, they don't... I'm not giving them what they want. They want to get this guy, and they want to call these guys shooters when they're just drug dealers, but I'm not going to get my deal. And then you have evidence of kind of a change of heart that corresponds, time-wise, with when he starts giving them what the government ultimately used in a proper session. Isn't that pretty significant information that might have impacted the defense's presentation, and certainly has caused examination of Watson? Well, I pushed back a little bit on whether that's the timeline, whether there's this change of heart that happens at that same time. And so, look, I think context matters. I think, number one, in the call that I think Your Honor is referring to, we don't have to guess at what Marcus Laborde sort of planned to do if he thinks he didn't have enough, because he said it on the call. He said, in the beginning, I walked in and I was lying, and I got to the place where I was like, you know what, forget this. I'm all in, and what I'm telling them is the God's honest truth. I mean, that's a quote from Marcus Laborde on that call. There's no suggestion that he plans to lie. I mean, the suggestion is quite the opposite. But in any event, I mean, Marcus Laborde was cross-examined on these topics at trial, and so what we're really talking about here in terms of materiality and in terms of what difference this could have made at the trial, what we're talking about is not a scenario where there could have been a whole defense investigation and a whole defense case that would have flowed from this. We're talking about the incremental cross-examination value, because again, the calls themselves are not admissible. So we're talking about the incremental cross-examination value of a single government witness who was extensively cross-examined at trial in a case where the evidence that that witness provided comes from so many other sources. So I think on the materiality point, the defendant cannot be the burden. Okay. Appreciate it. Thank you. Hearing no further questions, I thank you for your argument. Thank you, Your Honor. We'll hear again from Attorney Leavitt. Thank you, Your Honors. Yeah, Marcus LaBorde, in the withheld statements, at the end of the day said, they're asking me about MOOC, Mr. Pippins. Then he says, I just don't have enough. He says that, yeah, like, I don't know. Maybe I don't have enough, and like, damn. So am I going to get this, excuse me, shit for nothing, but that, quote, if they were to get convictions off some real hardcore shit, there'd be, you know, time served. And we didn't have an opportunity either to cross-examine him about that or about anything else that he said, which is related in our brief, which would have made a material difference in the way the jury perceived him, just like if we had been permitted to cross to show the jury or play for the jury the car tape, it would have made a great impression on the jury with regard to how they reviewed the car. Remind me, I had it in my notes. This trial lasted how long? Several. It was a few weeks, Your Honor. Two or three weeks, I believe. I think it was two or three weeks, Your Honor. Yeah. So whatever this Court finds to be the standard with regard to the motivating factor, there's no question that we were entitled to an instruction which was accurate in the law, and there's no question that this Court has held in United States v. Concepcion that the legislative history states that the statutory language was included as a means of prescribing murder and other violent crimes committed as an integral aspect of membership. And that's what we asked for, the exact words from Concepcion, which were repeated in United States v. Tide two years later, or in the alternative of the substantial motivating factor language, which is taken directly from United States v. White. In fact, as we point out in our brief on page — Excuse me, but you proposed the alternative just must be within the defendant's general purpose. Not for purposes of the final instruction that we requested. In fact, what the Court said, what the Court said at page 1826, the integral aspect language or consistent with White, which was the substantial motivating factor language, that is the request that I am denying. That's what she said, specifically that request. So that was the last thing that we asked for specifically, because I wanted the record to be clear what we were asking for. I'm asking that the Court instruct either consistently with Arrington the integral aspect language or consistent with White the substantial motivating factor language. The Court agreed, quote, that is the request that I am denying. And again, that's at transcript page 1826. So that's what we asked for, and we were entitled to it. The government's whole harmless error argument, with all due respect, is not supported at all by the record. As Your Honor pointed out, most of what the government was referencing were things that were occurring after the murder of Sean Pert. But when the government also says that they were relying on statements made by Mr. Pippins to show the harmless error nature of the errors, Marcus Laborde acknowledged that Pippins' one moment, please. Laborde recalled a conversation with Pippins in a car during which Pippins, quote, had an emotional breakdown and he was saying things like, miss my brother, he had to go, I had to do it. Clearly a personal motive. The government played one of Pippin's musical compositions during Laborde's arrest in which another member was lip syncing Mr. Pippins, saying, when they took my brother, ain't nobody try to step up. I wouldn't be a man if I ain't ever step up. Again, clearly personal motives. Mr. Watson said that in conversation with Mr. Pippins, Mr. Pippins supposedly said, they took my baby boy, namely Mellie, of course, adding while making a gun gesture, I did boy dirty for that, I did boy dirty for that. Clearly a personal motive. Many of his songs reflected a personal motive. Not one of his songs, not one of his statements reflected that he was motivated in any way by the Five Nine Grims, which Marcus Laborde said he had no loyalty whatsoever. Thank you. Appreciate it. Thank you both. Appreciate your arguments. Thank you for letting us keep going along, and we will take this under advisement. We have three cases on submission today, 24-1904 U.S. v. Lockhart, 23-360 Narvez v. United States, and 25-266 United States v. Ryan Buckley. We will take those all on submission. And with that, the Courtroom Deputy can adjourn the proceedings. Thank you, everybody. Court is adjourned. Thank you.